917 P.2d 949 (1996)
In the Matter of the PARENTAL RIGHTS AS TO Vanessa Nicol MONTGOMERY,
Cherrel A. MONTGOMERY, Appellant,
v.
The STATE of Nevada, DEPARTMENT OF HUMAN RESOURCES, DIVISION OF CHILD AND FAMILY SERVICES, Respondent.
No. 27557.
Supreme Court of Nevada.
May 30, 1996.
*951 Ronald W. Rovacchi, Las Vegas, for Appellant.
Frankie Sue Del Papa, Attorney General and Linda C. Anderson, Deputy Attorney General, Carson City, for Respondent.

OPINION
STEFFEN, Chief Justice:
Appellant Cherrel A. Montgomery challenges the district court's order terminating her parental rights. Cherrel contends that the district court lacked the requisite jurisdictional and dispositional grounds to terminate her rights as a parent. We agree and reverse.

FACTS
Vanessa Nicol Montgomery was born to Cherrel on September 10, 1989, in Yakima, Washington.[1] In February 1993, Cherrel and then three-year-old Vanessa moved to Las Vegas.
Clark County Child Protective Services ("CCCPS") first became involved with Cherrel and Vanessa on May 7, 1993. Police officers responding to a family fight call at the apartment where Vanessa was living with Cherrel and her boyfriend, Rob Coleman, took Vanessa to Child Haven because Cherrel was intoxicated and unable to care for the child. As a result of Cherrel's cooperation with CCCPS, a case officer determined that family preservation was the best approach and involved Cherrel in Home Base Family Services ("Home Base") for counseling on issues of parenting and alcohol abuse.[2] Additionally, Cherrel left her boyfriend and found a place to live. Vanessa was returned to Cherrel's custody.
On June 10, 1993, Vanessa was taken to Clark County Juvenile Hall after she was found wandering around her apartment complex and police were unable to locate Cherrel. The mother had left Vanessa with a babysitter and the child wandered away from the sitter's apartment. Candace Bennett, a protective officer with Family Youth Services, ordered Cherrel to secure appropriate supervision for Vanessa and referred the case to Cherrel's ongoing caseworker with a recommendation that Cherrel continue with family preservation counseling. Again, Vanessa remained in her mother's custody.
On August 10, 1993, Cherrel was arrested for DUI while en route to pick up Vanessa at a day care center, and Vanessa was transported to Child Haven. The following day, Cherrel voluntarily admitted herself to the VITA Day Treatment Program at the Nevada Treatment Center.
After the August incident, Bennett talked to both Cherrel and Vanessa. Bennett described Vanessa as very well-adjusted, developed mentally, and quite bonded with Cherrel. Bennett also visited Cherrel's residence and found it to be "clean and appropriate for a child." Bennett felt that alcohol was at the heart of Cherrel's problem; she also recognized that Cherrel was cooperative and seemed sincere in her desire to overcome her alcoholism. At the time, Cherrel was still involved with Home Base. According to Bennett, Cherrel was a good mother when sober and she would have no problem recommending that Vanessa live with her mother once the alcohol problem was resolved. However, Bennett also believed that it would take long-term sobriety to demonstrate Cherrel's commitment, and therefore recommended *952 that Vanessa be made a ward of the court and placed with the Department of Child and Family Services ("DCFS").
On August 18, 1993, CCCPS filed a petition to declare Vanessa a ward of the court because Cherrel's "use of alcohol adversely affects her parenting abilities." Cherrel admitted to the allegations of the petition and on September 15, 1993, Vanessa was adjudicated a neglected child and made a ward of the court.
Linda Kennedy, the DCFS social worker assigned to the case, agreed that Cherrel's alcohol abuse was the main obstacle to Vanessa remaining with Cherrel. Accordingly, Kennedy developed a case plan for reunification that would deal with this issue. The plan required that Cherrel: (1) remain in the VITA program to address alcohol abuse; (2) enter individual counseling; (3) submit to random urine analyses (UAs); (4) secure a stable job; (5) attend AA meetings; (6) secure day care; and (7) pay child support.
Cherrel immediately started complying with the reunification plan. At the periodic review on February 15, 1994, Kennedy assessed Cherrel's compliance during the first six months as excellent. Although Cherrel had one relapse in November, she took appropriate steps to get back on track. According to Kennedy, "[r]elapse is a part of treatment. I mean you expect people to relapse, so I didn't have a problem with that." During this initial evaluative period, Cherrel had regular visits with Vanessa which increased over time. On March 31, 1994, Vanessa went home with Cherrel.
Kennedy visited Cherrel's home every other month and generally found that the home was clean, there was sufficient food and Vanessa was in good physical condition. However, at some point Kennedy began having problems contacting Cherrel to monitor her progress. On June 6, 1994, Kennedy tried to make a home visit after receiving a call from Rob saying that Cherrel had been drinking and had left with Vanessa. When Kennedy arrived at the apartment, the apartment was a "mess" and Rob told her that Cherrel was at another address. Kennedy went there and saw Cherrel's truck, but was unable to locate Cherrel. Kennedy and another social worker returned to Cherrel's apartment. Although Rob initially said Cherrel was out, he eventually let them enter the apartment where they found Cherrel in an apparently intoxicated state. Consequently, Vanessa was removed from the home and placed in foster care.
Thereafter, Cherrel wrote a letter to DCFS stating that she was no longer drinking and had left Rob. She also called and asked to talk with or see Vanessa; however, this request was denied. Occasionally, Kennedy received collect calls from Cherrel, which she could not accept. When Kennedy tried to return the calls, Cherrel either wasn't at the number or the number had been disconnected. At some point in July 1994, Cherrel disappeared. Kennedy testified that Cherrel had no contact with DCFS and provided no financial support for Vanessa from July to December 1994.
During this time, Cherrel went with Rob to Texas and then to Florida. Cherrel claimed that she was sober throughout this time, but was not in treatment. Eventually, she decided to leave Rob and returned to Las Vegas around Thanksgiving. When she returned to Las Vegas, she secured a job as a certified nurse assistant ("CNA") at Life Care Center, a convalescent home.
On December 2, 1994, Kennedy filed a petition to terminate Cherrel's parental rights.[3] The petition alleged as jurisdictional grounds, neglect, unfitness and failure of parental adjustment.
Also in December, Cherrel contacted Kennedy. She explained that she had been back since Thanksgiving, had left Rob, was now working two jobs and attending AA meetings. During this call Cherrel learned of the action to terminate her rights, and expressed her intent to oppose the petition. Cherrel thereafter appeared at a hearing on February 16, 1995, to oppose the petition, and the court appointed an attorney to represent her.
*953 A contested hearing on the termination petition was held on March 17, 1995. Kennedy testified that if Cherrel could be rehabilitated, it would be best for Vanessa to be with her mother.[4] However, based on Cherrel's prior history, Kennedy concluded that Cherrel could not be rehabilitated and that further efforts by DCFS would not change Cherrel's situation because of her chronic alcoholism and Vanessa's fear of her mother's drinking.
Denise Bydlowski, a licensed practical nurse and Cherrel's supervisor over a period of four months, rated Cherrel as one of her best CNAs. Bydlowski said she was aware of Cherrel's problems with alcohol, but that as far as she knew Cherrel was sober.[5] Cherrel's husband, Richard James Good,[6] testified that he is prepared both emotionally and financially for the responsibility of raising Vanessa and would be willing to adopt the child. Good is a non-drinker and also works at Life Care Center.
Cherrel explained that she has been sober since December 9, 1994. She testified that she goes to AA meetings at least every other night and has a sponsor who has been sober for thirteen years. When asked why the court should now believe that she will remain sober, Cherrel responded that this time she was doing it for herself whereas before she had achieved sobriety in order to be reunited with her daughter. She asked the court to give her an opportunity to demonstrate that she could stay sober.
At the conclusion of the March 17, 1995 hearing, the district court stated that jurisdictional grounds of abandonment and unfitness had been proved "without a doubt." The judge said that "to some degree" he was "impressed with the fact the mother is trying." However, the judge was concerned about the damage that had already been done to Vanessa and the damage that would result if she were returned to Cherrel only to have the mother suffer another relapse. The judge explained that he was inclined to go ahead and terminate Cherrel's rights. However, the judge also expressed concern that on appeal the supreme court might conclude there was not clear and convincing evidence to support the termination. Further, "the mother made a promise to us. Promise was that she'd be able to resolve this matter within a short period of time. To the degree reunification could occur." Consequently, the judge decided to continue the case for four months to explore whether Cherrel could "sustain an effort longer than just a few months. Even though then this Court may very well abide by its earlier decision after consideration."
Cherrel and DCFS entered into a revised case plan on April 27, 1995. Under the revised case plan, Cherrel had to: (1) attend counseling to deal with patterns of relapse; (2) submit to random UAs; (3) attend AA meetings at least three times per week; (4) attend parent training classes; (5) pay child support of $100 per month; and (6) provide a background check on Mr. Good.
The hearing continued on July 14, 1995. Kennedy testified that Cherrel had complied with the plan. Although Cherrel had attended only two drug counseling sessions, this was because she had to wait for an opening in the program. DCFS had requested eight UAs, all of which were clean. Kennedy had verified at least fifteen AA meetings per month. Cherrel was on a waiting list for parenting classes because the classes required that the child be in the home. Cherrel had paid the required support, and the background check on Good indicated no criminal history. Kennedy also visited the home, which was clean.
*954 Despite Cherrel's compliance with the revised reunification program, Kennedy testified that she remained concerned about a relapse based on Cherrel's history. Consequently, she still recommended termination.
Jacqueline Harris, a mental health counselor at DCFS, also testified. Harris had six sessions with Vanessa since April 25, 1995. Vanessa had expressed fear and insecurity when asked about living with her mother. Harris diagnosed Vanessa as suffering from chronic post-traumatic stress, requiring a high level of care in a structured, nurturing environment. She explained that if reunification were attempted, it would be traumatic at first for Vanessa and would have to proceed at Vanessa's pace. Harris opined that such a reunification would take at least six months to complete. Finally, Harris testified that if there were a reunification, a relapse on Cherrel's part would have a "severe" impact on Vanessa.
Cherrel testified that she was still doing well at work and that she was attending AA. She explained that she has learned to deal with stress by talking to her AA sponsor or a counselor rather than drinking. She testified that in the next month she would begin paying the arrearage in support.
At the conclusion of the July 14 hearing, the district court decided to terminate Cherrel's parental rights. The judge was still concerned about a relapse and felt that Vanessa deserved some sort of permanency in her life:
Now, is the time to say I have to look after Vanessa. That mymy concern here is not the success or the failures of this mother. My concern here must be to protect Miss Vanessa. Vanessa has moved on in her life. She has found a stable placement. She has, in fact, found a family. A family who loves her, provides her with everything that she needs, to a child that has high needs. It very well may be thatthat the mother has succeeded, but so long as there is any risk.
Accordingly, the district court then concluded that jurisdictional grounds of unfitness and failure of parental adjustment had been demonstrated by clear and convincing evidence and that termination was in Vanessa's best interest.
On July 27, 1995, the district court entered its findings of fact, conclusions of law and order terminating parental rights. The district court found that Cherrel was an unfit parent, had placed Vanessa at risk and had failed to adjust her situation. The conclusions of law also set forth abandonment as a basis for the termination.

DISCUSSION
Cherrel contends that there was insufficient evidence to support a termination based on abandonment, unfitness or failure of parental adjustment.[7] We agree.
The power to terminate parental rights is an "awesome power." Champagne v. Welfare Division, 100 Nev. 640, 645, 691 P.2d 849, 853 (1984). It is tantamount to a civil death penalty. Drury v. Lang, 105 Nev. 430, 433, 776 P.2d 843, 845 (1989). Consequently, actions of this nature and severity must be closely scrutinized. Kobinski v. State, 103 Nev. 293, 296, 738 P.2d 895, 897 (1987). However, we will uphold termination orders if they are based on substantial evidence, *955 and will not substitute our judgment for that of the trial judges who hear and observe the witnesses. Id. (citations omitted).
In order to terminate a parent's rights, both jurisdictional and dispositional grounds must be clearly and convincingly satisfied. The jurisdictional aspect of an action for termination involves a specific fault or condition directly related to the parent; whereas, the dispositional aspect of the action focuses on the best interest of the child. Champagne, 100 Nev. at 646-47, 691 P.2d at 854. As previously indicated, and repeated for purposes of emphasis, both grounds must be established by clear and convincing evidence. Id. at 648, 691 P.2d at 854.

Abandonment
The term "abandonment of a child" as used in NRS 128.105 is defined as "any conduct of one or both parents of a child which evinces a settled purpose on the part of one or both parents to forego all parental custody and relinquish all claims to the child." NRS 128.012(1). Intent is the decisive factor in abandonment and may be shown by the facts and circumstances. Smith v. Smith, 102 Nev. 263, 266, 720 P.2d 1219, 1221 (1986). However, a presumption of abandonment arises when "a parent ... leave[s] the child in the care and custody of another without provision for his support and without communication for a period of 6 months...." NRS 128.012(2).
In the present case, it is undisputed that Cherrel was out of contact for less than six months. Thus, the statutory presumption is inapplicable. Additionally, our review of the record demonstrates anything but a settled purpose on Cherrel's part to forego all parental custody and relinquish all claims to Vanessa. Prior to her absence, Cherrel made significant strides to overcome her problems with alcohol. It appears that her absence was in part due to a belief that she would be unable to regain custody of Vanessa; however, during that time she made several unsuccessful attempts to contact DCFS. When Cherrel returned to Nevada, she immediately obtained suitable employment and housing. She began attending AA meetings. She also contacted DCFS and, when informed of the action to terminate her rights as a parent, Cherrel made it abundantly clear that she would oppose the petition. She appeared at all hearings and complied with the revised case plan. The evidence substantially indicates that Cherrel intended to maintain a relationship with Vanessa and fight to regain custody of her daughter. Under these circumstances, we conclude that there was not clear and convincing evidence to support a jurisdictional finding based on abandonment.

Unfitness
The term "unfit parent" as used in NRS 128.105 is defined as "any parent of a child who, by reason of his fault or habit or conduct toward the child or other persons, fails to provide such child with proper care, guidance and support." NRS 128.018. Pursuant to NRS 128.106 certain conditions "diminish suitability as a parent," including:
4. Excessive use of intoxicating liquors, controlled substances or dangerous drugs which renders the parent consistently unable to care for the child.
....
8. Inability of appropriate public or private agencies to reunite the family despite reasonable efforts on the part of the agencies.
In the past, we have recognized that "all parents are guilty of failure to provide proper care on occasion; and a parent does not deserve to forfeit the sacred liberty right of parenthood unless such unfitness is shown to be severe and persistent and such as to render the parent unsuitable to maintain the parental relationship." Champagne, 100 Nev. at 648, 691 P.2d at 855 (footnote omitted) (emphasis added). The term "unsuitable" describes "a parent who by reason of persistent fault or state of incapacity deserves to have his or her parental rights terminated or who must sacrifice such parental rights in the interest of the child, by reason of irremedial inability to function as a proper and acceptable parent." Id. at 648 n. 5, 691 P.2d at 855 n. 5 (emphasis added).
*956 After reviewing the record in the present case, we are unable to conclude that there was clear and convincing evidence of Cherrel's unfitness. Every social worker involved with this case identified Cherrel's alcoholism as the sole issue bearing on Cherrel's suitability as a mother. It is uncontroverted that Cherrel is a chronic alcoholic. What is controverted is whether her condition is irremediable. Kennedy testified that in her opinion Cherrel would not be able to maintain her sobriety. This conclusion is belied by the record; in particular by Cherrel's conduct since December 1994. Once again, we note that Cherrel has a stable job, where she has been successful. She has married a man who has a stable job, no criminal background and does not drink. When given an additional four months to demonstrate her commitment to remaining sober, Cherrel fully complied with the revised case plan. Alcoholism is a devastating disease with tragic consequences for both alcoholics and their families and friends. Here, however, we are faced with a mother who, although struggling, has made significant progress. In light of the total record, we are simply unable to conclude that Cherrel's condition was irremediable. In fact, her recent conduct demonstrates otherwise.

Failure of Parental Adjustment
"Failure of parental adjustment" as used in NRS 128.105 arises
when a parent or parents are unable or unwilling within a reasonable time to correct substantially the circumstances, conduct or conditions which led to the placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the state or a private person or agency to return the child to his home.
NRS 128.0126. Although failure of parental adjustment may provide a jurisdictional ground for termination, "it is fraught with difficulties and must be applied with caution." Champagne, 100 Nev. at 652, 691 P.2d at 857. The task in failure to adjust cases is to realistically evaluate the parent's efforts to adjust "circumstances, conduct or conditions" within a reasonable amount of time to justify the child's return home. The main concern is permanency of adjustmenta child should not be held in limbo indefinitely. Id. at 651, 691 P.2d at 857.
We agree with the district court's concern for the amount of time that Vanessa has been in the court's custody. However, we are disturbed by the district court's decision to give Cherrel four months to demonstrate that she could remain sober and, thereafter, concluding that her full compliance with the revised case plan was insufficient to demonstrate she could remain sober. During the approximately twenty-two months (September 1993 to July 1995) that Vanessa was made a ward of the court, there was a five-month period (July to December 1994) where Cherrel did not make efforts to adjust and a three-month period (January to March 1995) where Cherrel made partial efforts to adjust; otherwise, Cherrel made substantial efforts to adjust.
The present case is completely unlike that of Kobinski v. State, 103 Nev. 293, 738 P.2d 895 (1987), wherein this court upheld the termination of a mother's parental rights for, inter alia, failure of parental adjustment despite evidence that the mother had found employment, a home, a fiancee and had conquered her drinking problem. In Kobinski, the mother had made this progress only after ten years of frequent state intervention during which time she completely failed to meet minimal requirements to retain custody of her children. As noted above, Cherrel's situation is much different.
In light of the total record, we are unable to conclude that Cherrel has reached the point where society must give up on her motherhood. See Champagne, 100 Nev. at 651, 691 P.2d at 857. We further conclude that there was not clear and convincing evidence that Cherrel had failed within a reasonable amount of time to correct the condition (her drinking) which led to Vanessa's removal.
Because none of the jurisdictional findings were supported by clear and convincing evidence, we conclude that the district court erred in finding jurisdictional grounds for termination of Cherrel's parental rights. *957 Therefore, we need not address the district court's findings with respect to dispositional grounds for termination. See id. at 647, 691 P.2d at 854.
We note, however, that the record indicates Vanessa still loves Cherrel and wants to visit her, although Vanessa is afraid to live with Cherrel because of Cherrel's drinking problem. Testimony during the second hearing indicates that reunification would be possible, but that it must progress at a pace consistent with Vanessa's ability to handle such a transition without undue trauma. We conclude that Cherrel deserves a chance to show her daughter that she can remain sober and care for her.[8] We emphasize, however, that we fully respect and encourage whatever measures may be necessary to attempt a reunification that will bless, rather than injure, the long-suffering child.

CONCLUSION
For the reasons set forth above, we conclude that jurisdictional grounds for termination were not proved by clear and convincing evidence. Vanessa shall remain in the custody of the district court while DCFS develops a plan to reunify Cherrel and Vanessa, if at all possible.
Accordingly, we reverse the termination of Cherrel's parental rights and remand the case to the district court for further proceedings.
SPRINGER and ROSE, JJ., concur.
SHEARING, Justice, with whom YOUNG, Justice, joins, dissenting:
I dissent because I believe that there was sufficient evidence to support the trial court's decision. On appeal, our review is limited to determining whether there was clear and convincing evidence to support the judgment. Kobinski v. State, 103 Nev. 293, 296, 738 P.2d 895, 897 (1987). This court may not substitute its own evaluation of the evidence for that of the district court where the district court had an opportunity to hear the witnesses and judge their demeanor. Id.
I sympathize with the majority view that Vanessa's mother has valiantly attempted to conquer her alcoholism and to act as a mother to Vanessa. However, she has also frequently lapsed and disappeared from Vanessa's life for months at a time. Termination of parental rights cases in which the parent is struggling with substance abuse are some of the most difficult. Often the parent truly wants to be a good parent and can be one for awhile, but then relapses into a state in which the drugs or alcohol have greater importance than the child. The child is then abandoned. The question becomes, how long is it fair to the child to continue in a life of instability and periodic abandonment? This is the difficult question with which a district court must wrestle. The district court is in a better position to make that determination than this court.
I do not agree that there was insufficient evidence of parental unfitness. In May 1993, police officers responded to a call concerning a family fight. Vanessa was found with bruises on her face and legs; her mother was so intoxicated she was unable to care for Vanessa. Vanessa was taken to Child Haven. At first, Vanessa's mother denied having a drinking problem, but smelled of alcohol while making this declaration. She eventually admitted that she had a drinking problem and was referred for counseling on issues of parenting and alcohol. Vanessa was returned to her mother's home. In June 1993, four-year-old Vanessa was found wandering around her apartment complex while her mother was out drinking and gambling. Vanessa was still allowed to remain in her mother's home. In August 1993, Vanessa's mother was arrested for DUI while en route to pick up Vanessa from a day-care center.
After this incident, in September 1993, Vanessa was made a ward of the State because she was at risk due to her mother's ongoing drinking problem. Vanessa's mother admitted in court that her use of alcohol adversely affected her parenting abilities. *958 The Department of Child and Family Services (DCFS) developed a caseplan and Vanessa's mother generally complied for a few months. She had a relapse in November, but she took appropriate steps to resume her compliance. In March 1994, Vanessa was returned to her mother's home. In June, the DCFS caseworker received a call that Vanessa was in danger because her mother was drunk. After an extensive search, the caseworker found Vanessa with her mother, who was intoxicated. Vanessa expressed relief that the caseworker had come for her. Vanessa was returned to a foster home. The caseworker was repeatedly unable to reach Vanessa's mother, and sometime in July, Vanessa's mother disappeared. It was later discovered that she had moved to Texas and then Florida. Vanessa's mother had no more contact with the DCFS until December 1994. In December, after there had been no contact for six months, the DCFS filed the petition to terminate parental rights.
Later in December, Vanessa's mother contacted DCFS to inform them that she was employed and attending AA meetings. She stated that she had been in the area for over a month, but had failed to contact DCFS or attempt to contact Vanessa. In March 1995, a contested termination hearing was held. The two Child Protective Service caseworkers who had the initial contacts with Vanessa and had unsuccessfully tried to work with Vanessa's mother testified at the hearing. The DCFS caseworker testified regarding her experience with Vanessa's mother. A former foster parent and the present foster parent of Vanessa, a registered nurse specializing in pediatric emergency nursing, testified about the problems that Vanessa had with insecurity, nightmares, screams in her sleep and emotional needs. The foster mother described how Vanessa was particularly needy and required constant reassurance that her foster family would be there for her. Vanessa told the family that she wanted to stay with them "forever and forever." The foster mother testified as follows:
The responses that I get from Vanessa are that she wants to visit her mother at the welfare office, but she said to me on many occasions she does not want to live with her mother. That she makes statements such as her mother drinks and that she fights. She says things such as, My mother says she will stop drinking, but she lies.
She has said many, many times over to me that there were times when her mother would not wake up. There was one instant she was talking with my children telling them that there was a cup of milk or whatever, they lived in a home with a lot of bugs and that she was drinking a glass of milk and a bug got on her face and she couldn't wake her mother up and she was scared.
Vanessa's mother and her new husband testified as to the improvements Vanessa's mother had made in her life.
At the conclusion of the March hearing, the district judge stated that if the best interests of the child were the only issue, there would be no question that he would grant termination. Nevertheless, he continued the hearing for four months to monitor the mother's actions and then to receive additional testimony.
In July, the hearing continued and a mental health counselor testified that she had evaluated Vanessa; she concluded that Vanessa suffered from chronic post-traumatic stress and needed a high level of structured care and a safe, nurturing environment. The counselor testified that if reunification with her mother were commenced and the mother had a relapse, the impact on Vanessa would be severe. Both Vanessa's mother and the DCFS caseworker testified that a caseplan had been developed after the first hearing in March. Vanessa's mother had maintained sobriety and had complied with all of the counseling requirements, to the extent possible, during the intervening four months.
The district judge found that there was clear and convincing evidence that Vanessa's mother was unfit and unable to adjust as a parent, and that Vanessa's best interests would be served by terminating her mother's parental rights. It does seem somewhat unfair for the judge to have given the mother an extra four months to show her stability *959 and then, when she did so demonstrate, terminate her rights anyway. Nevertheless, the evidence of Vanessa's mother's chronic problem was in the record, and even though she had made significant progress, the evidence of frequent prior relapses is sufficient to conclude that the problem was irremediable. Moreover, the judge was particularly concerned with Vanessa's best interests, her two years of instability, her need for security and the devastating consequences to her if her mother relapses. There may be a legitimate difference of opinion as to which course is in Vanessa's best interests, but this court should not substitute its own judgment for that of the district court.
NOTES
[1] Cherrel has two other children who are living with their respective fathers in Washington. According to Cherrel, these children were taken from her because of her drinking, but Washington protective services did not attempt to reunite her with her children and, at the time, Cherrel thought the children would be better off with their fathers.
[2] Cherrel started drinking when she was fifteen years old.
[3] The petition also sought the termination of the father's parental rights. Cherrel identified Thomas Thompson as the father; however, their relationship consisted of a single evening, and DCFS has been unable to locate him. The father's rights are not at issue in this appeal.
[4] Vanessa had expressed love for her mother and a desire to visit her, but did not want to live with her. Kennedy explained that Vanessa might have developmental problems and needed a stable, secure home environment. Kennedy also testified that Vanessa might suffer from Fetal Alcohol Syndrome. However, Vanessa has not been tested for the condition and there was no evidence, other than Kennedy's testimony, that Vanessa actually suffers from FAS.
[5] Life Care Center conducts random drug testing of its employees.
[6] Cherrel and Good were married on February 14, 1995. They had known each other for approximately eighteen months prior to the marriage.
[7] NRS 128.105 sets forth the basic considerations relevant to determining whether to terminate parental rights. It provides, in relevant part:

An order of the court for termination of parental rights must be made in light of the considerations set forth in this section and NRS 128.106, 128.107 and 128.108, with the initial and primary consideration being whether the best interests of the child would be served by the termination, but requiring a finding that the conduct of the parent or parents demonstrated at least one of the following:
1. Abandonment of the child;
....
3. Unfitness of the parent;
4. Failure of parental adjustment;
....
6. Only token efforts by the parent or parents:
(a) To support or communicate with the child;
....
(c) To avoid being an unfit parent; or
(d) To eliminate the risk of serious physical, mental or emotional injury to the child; or
7. With respect to termination of the parental rights of one parent, the abandonment by that parent.
[8] Because of the pending termination petition, Cherrel has not been allowed contact with Vanessa since December 1994.