In the Matter of the Parental Rights as to DESTINY MONET GONZALES and BRITTANY DOMINIQUE GONZALES.

GLORIA ANN GONZALES, Appellant, v. DEPARTMENT OF HUMAN RESOURCES OF THE STATE OF NEVADA, DIVISION OF CHILD AND FAMILY SERVICES, Respondent.

No. 28637

February 26, 1997 933 P.2d 198

*Rovacchi, Kent & Cordes,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, and *Linda C. Anderson,* Deputy Attorney General, Carson City, for Respondent.

## OPINION

By the Court, ROSE, J.:

### FACTS

Gloria Gonzales (Gloria) and Benjamin Gonzales (Benjamin) met as teenagers growing up in a neighborhood in Indio, California. Gloria ran away from home and started living with Benjamin when they were fifteen years old, and she became pregnant with their first of six children,[1] Vanessa Andrea Gonzales (Vanessa), who was born January 1, 1979. At some point, Gloria and Benjamin married and had a second child, Crystal Monique Gonzales (Crystal), on July 25, 1982. Gloria and Benjamin later moved to Las Vegas where Gloria gave birth to the two children at issue in this appeal—Destiny Monet Gonzales (Destiny), born September 26, 1990, and Brittany Dominique Gonzales (Brittany), born August 9, 1991.

Vanessa and Crystal were removed from Gloria and Benjamin's care and made wards of the State of California in 1985. At that time, both Gloria and Benjamin had heroin and cocaine addictions, and Benjamin was incarcerated in California for a drug-related offense. Vanessa and Crystal were returned to the Gonzaleses in 1987, but were subsequently removed after Gloria tested positive for opiates in 1988. After several more years in foster care, Vanessa and Crystal were returned to their parents, who had since moved to Las Vegas in September, 1992, with Interstate Compact in Nevada monitoring the placement.

---

[1] Two of the Gonzales' children were taken from the home and relinquished to adoptive families due to the Gonzales' problems with drug use.

By 1993, Vanessa, Crystal, Destiny, and Brittany were living with their parents in a Las Vegas apartment. Gloria was working at a convenience store and Benjamin was unemployed due to a job-related injury. On March 19, 1993, the Gonzaleses were evicted from their apartment. Gloria and Benjamin told the four girls to wait on the sidewalk outside of the apartment building while they went to seek alternate housing for the family.

The landlord called the police about the unattended children, the North Las Vegas Police came and talked with the girls, ascertained that they had not eaten in almost eight hours, and then transported the four children to Clark County Juvenile Court, where they were placed in protective custody. Vanessa and Crystal, who were still wards of the State of California, were sent to live with Benjamin's mother in California, while two-year-old Destiny and one-year-old Brittany were placed in Child Haven and later in the custody of the Division of Child and Family Services (DCFS) which placed them in the foster home where they currently reside.

Because of Gloria and Benjamin's documented history of drug abuse, Child Protective Services (CPS) listed abstinence and random drug-testing as a condition to be met before Destiny and Brittany would be returned. Vanessa and Crystal's social worker tried to find a place for the family to live and transported Gloria to court proceedings and to drug test appointments. Gloria missed some appointments and tested positive for drugs at another. Shortly after Destiny and Brittany had been removed, Gloria and Benjamin got into a fight, and Benjamin was arrested for assault with a deadly weapon. Benjamin remained incarcerated for about a month. Meanwhile, Gloria had been arrested and jailed for outstanding traffic warrants, and on April 2, 1993, she tested positive for cocaine usage.

CPS filed a petition alleging that Destiny and Brittany were in need of protection due to Gloria's drug abuse and the inability of the Gonzaleses to provide for the children. On April 15, 1993, Gloria and Benjamin admitted to the petition, and DCFS took custody of Destiny and Brittany on May 6, 1993. The juvenile court and DCFS developed a case plan for reunification, ordering the parents to do the following: (1) maintain stable housing and employment; (2) complete parenting classes; (3) attend Narcotics Anonymous meetings; (4) submit to random drug testing; (5) maintain regular visitation; (6) notify the social worker of any changed circumstances; and (7) pay child support.

By the first six month court review, in November of 1993, Gloria had enrolled in a methadone program at Nevada Treatment Center and had passed random drug tests administered at the Center. She and Benjamin were attending Alcoholics Anonymous

and Narcotics Anonymous meetings and had partially completed parenting classes. Benjamin was receiving SIIS benefits, and he and Gloria had found a small studio apartment. They had been visiting Brittany and Destiny on a monthly basis, and increased visitation was recommended as reunification appeared to be a viable goal.

However, Gloria and Benjamin separated in December of 1993, and Gloria moved in with a boyfriend. She worked at a convenience store, kept house for an elderly couple, continued her methadone maintenance treatments, and visited Destiny and Brittany every six to eight weeks. On April 29, 1994, Benjamin was murdered while visiting Gloria at the residence she shared with her then boyfriend. Gloria had fought with her boyfriend earlier that day and acknowledged at the termination hearing that the police considered her boyfriend a suspect in Benjamin's murder.

On May 3, 1994, several days after Benjamin's murder, and just a few days before the second scheduled status check, Destiny and Brittany's social worker, Carol Denley (Denley), called Gloria at her housekeeping position and encouraged Gloria to maintain contact with her; Denley testified that she had wanted Gloria to help her break the news of Benjamin's death to Destiny and Brittany.[2] However, neither the children nor DCFS heard from Gloria again until April of 1995. Gloria testified that after speaking with Denley in May, 1994, she fled to California where she abused drugs for approximately six months. Gloria stated that she then entered a religious-based drug rehabilitation program, "Victory Outreach," where she stayed for eight months.

On April 11, 1995, Gloria finally contacted Denley and told Denley of her whereabouts and activities over the past year. Gloria temporarily left the Victory program to attend a May, 1995 status check, where she asserted that the judge encouraged her to leave the inpatient program before completing the full year of treatment and to attempt to locate adequate housing. On July 1, 1995, Gloria withdrew from the Victory program and moved in with Benjamin's mother and sister in California, where her older daughters, Vanessa and Crystal, had been living. She enrolled in an outpatient drug abuse program. Upon satisfactory completion of that program, her two older daughters, Vanessa and Crystal, were returned to Gloria's physical custody.

Gloria then entered into a relationship with Richard Weber (Weber), and moved into his home with Vanessa and Crystal in September, 1995, after Gloria's sister-in-law would no longer

---

[2]Contrary to the facts recounted in the dissent, the record does not indicate that Brittany or Destiny witnessed the murder of Benjamin.

allow Gloria and the girls to stay in her home. At this time, sixteen-year-old Vanessa had a one-month-old child of her own and thirteen-year-old Crystal had had some delinquency problems (e.g., she ran away for three weeks). Gloria did not obtain employment following her return until two weeks before the termination hearing, and she continued to receive welfare benefits for her older girls.[3]

According to DCFS, following her year long absence from Destiny and Brittany's lives, Gloria had seen the younger girls only once, in May of 1995. Gloria has not provided any financial support or given any cards or gifts to the girls since they were removed from her custody in 1993. Furthermore, the girls celebrated birthdays in August and September, 1995, following Gloria's July 1, 1995 release from rehabilitation, yet they received no acknowledgment from their mother.

Denley testified that one of the biggest problems barring reunification was the fact that "the girls do not know who [Gloria] is." DCFS contends that Destiny and Brittany have become bonded to their foster family (who seeks to adopt them) and that they no longer inquire about their natural mother. The foster family is also of hispanic background; the foster parents have been married for twenty years; the father has stable employment; and the mother stays at home with Destiny and Brittany and her other children (two other foster children, an eight-year-old adopted son, and a fifteen-year-old biological daughter). Denley testified that Destiny and Brittany appeared to be thriving in this environment. Due to Destiny and Brittany's young age, in November, 1994, DCFS first considered initiating termination proceedings after six months had passed without any contact from Gloria. Denley testified that she would not have pursued such action had the girls been older. On July 17, 1995, DCFS filed a petition to terminate Gloria's parental rights as to Destiny and Brittany, notwithstanding Gloria's reappearance in April of 1995, and her apparent new-found stability. As grounds for termination, the petition asserted abandonment, neglect, unfitness of the parent, failure of parental adjustment, risk of harm to the girls, and "token efforts" as elaborated upon in NRS 128.105.

On September 28, 1995, the district court appointed counsel for Gloria. A contested hearing was held on December 29, 1995, wherein the district court found that Gloria had intentionally

---

[3]Notwithstanding the dissent's contention that Weber was acting as a father to Gloria's older children, it should be emphasized that Weber was not financially supporting Gloria or her children, who continued to receive government benefits. Moreover, at the time this case was argued before this court, Gloria could not be found and Weber did not have knowledge of her whereabouts.

abandoned Destiny and Brittany for almost a year, as evidenced by the fact that she failed to contact DCFS and to support or contact the children "for at least six months concerning the children's health, welfare or well-being."

The district court also found a failure of parental adjustment, noting that:

> [Gloria] has been "unable or unwilling within a reasonable time to correct substantially the circumstances, conduct or conditions which led to the placement of [her children] outside of [her] home, notwithstanding reasonable and appropriate efforts made by the state or a private person or agency to return the [children] home." Although the mother had made recent efforts to remain free of drugs, she did not change her circumstances in a reasonable period of time and instead abandoned these children.

(quoting NRS 128.0126, which defines "failure of parental adjustment"). The district court concluded that the best interests of Destiny and Brittany would be served by terminating Gloria's parental rights and entered an order so stating.

Gloria now challenges the district court's termination of her parental rights. We conclude that Gloria's contentions are without merit, and affirm the holding below.

## DISCUSSION

*Clear and convincing evidence established jurisdictional and dispositional grounds for the termination of appellant's parental rights*

NRS 128.105 sets forth the basic considerations relevant in determining whether to terminate parental rights.[4] This court, in

---

[4]NRS 128.105 states:

The primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination. An order of the court for termination of parental rights must be made in light of the considerations set forth in this section and NRS 128.106 to 128.109, inclusive, and based on evidence and include a finding that:

1. The best interests of the child would be served by the termination of parental rights; and

2. The conduct of the parent or parents demonstrated at least one of the following:

(a) Abandonment of the child;

(b) Neglect of the child;

(c) Unfitness of the parent;

(d) Failure of parental adjustment;

applying NRS 128.105, has stated that two kinds of grounds must be considered in termination proceedings. Champagne v. Welfare Division, 100 Nev. 640, 646-47, 691 P.2d 849, 854 (1984). "[T]here must be *jurisdictional* grounds for termination—to be found in some specific fault or condition directly related to the parents—and dispositional grounds—to be found by a general evaluation of the child's best interest." *Id.* at 647, 691 P.2d at 854. Both grounds must be established by clear and convincing evidence. *Id.* at 648, 691 P.2d at 854. NRS 128.105, as amended in June 1995, keeps intact the jurisdictional and dispositional categories, but places primary importance on the dispositional grounds, that is, the best interests of the child. This court will uphold an order of termination if it is based on substantial evidence and will not substitute its judgment for that of the trial judge who heard and observed the witnesses. Kobinski v. State, 103 Nev. 293, 296, 738 P.2d 895, 897 (1987). We conclude that DCFS presented substantial evidence upon which the termination of Gloria's parental rights was based.

*Jurisdictional grounds*

In her "Pre-Trial Memorandum," Gloria stated that, "If the Court applies a strict interpretation of the grounds set forth in the petition [abandonment, failure of parental adjustment, etc.] to the facts relating to Mrs. Gonzales' compliance . . ., then *Mrs. Gonzales is prepared to concede that [DCFS] will be able to establish jurisdictional grounds for termination."* (Emphasis added.) Gloria's brief continued, *"there is no denying that during a nearly one (1) year period in 1994-95, Mrs. Gonzales dropped out of sight, did not keep in contact with the case worker and did not attempt to comply with the court-ordered case plan."* (Emphasis added.) Gloria urged the district court to, nonetheless, give her a second chance to parent Destiny and Brittany.

At the December 29, 1995 termination hearing, after hearing testimony and following the presentation of evidence, the district court concluded that:

> Relative to the first grounds, the issue of *jurisdictional grounds,* I think it's even conceded by everyone, I don't

---

(e) Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;
 (f) Only token efforts by the parent or parents:
 (1) To support or communicate with the child;
 (2) To prevent neglect of the child;
 (3) To avoid being an unfit parent; or
 (4) To eliminate the risk of serious physical, mental or emotional injury to the child; or
 (g) With respect to termination of the parental rights of one parent, the abandonment by that parent.

think there's really a dispute here that under the law, the ground of *abandonment* has been met. The statute does presume that if there is six months of no contact, failure to support, and failure to maintain any communication, that there is a presumption of abandonment under NRS 128.012.

Equally under NRS 128.109, there is a presumption that . . . within six months if the child is in the custody of [DCFS] and the parent fails to make the appropriate adjustment after being placed, that the ground of *failure of parental adjustment* . . . is presumed, and the Court does make those findings.

(Emphasis added.) We conclude that the district court did not err in its conclusions.

### Abandonment

NRS 128.012 defines abandonment as follows:

1. "Abandonment of a child" means any conduct of one or both parents of a child which evinces a settled purpose on the part of one or both parents to forego all parental custody and relinquish all claims to the child.

2. If a parent or parents of a child leave the child in the care and custody of another without provision for his support and without communication for a period of 6 months, . . . the parent or parents are presumed to have intended to abandon the child.

In Sernaker v. Ehrlich, 86 Nev. 277, 280, 468 P.2d 5, 7 (1970), this court held that abandonment of a child is conduct on the part of the parent that is intentional and shows a settled purpose to relinquish all parental rights in the child.

On appeal, Gloria argues that while her one year disappearance from the children's lives satisfied the presumption of abandonment and failure of parental adjustment, as enunciated in NRS 128.012 and 128.0126, DCFS failed to prove that Gloria had ever intended to abandon Destiny and Brittany. We conclude that Gloria's conduct clearly and convincingly satisfied the definition of abandonment and that she did not rebut the presumption of NRS 128.012(2).[5] In Pyborn v. Quathamer, 96 Nev. 145, 147, 605 P.2d 1147, 1148 (1980), this court upheld a district court finding of abandonment where the father made no attempt to communicate with his son for a period of ten months, coupled with "token efforts, to pay support for the child." Additional

---

[5]We are perplexed by the dissent's chastisement of the district court for applying this statutory presumption. The language of NRS 128.012 is not discretionary.

evidence of abandonment has been recognized in a parent's lack of support, failure to communicate, and failure to send gifts to his children. *Sernaker,* 86 Nev. at 280, 468 P.2d at 7.

Recently, in Greeson v. Barnes, 111 Nev. 1198, 1204, 900 P.2d 943, 947 (1995), this court terminated a father's parental rights where the father failed to pay child support, exercised visitation rights for only six months during a five-year period, and gave his son only one Christmas gift. Although the court acknowledged that the father's appeal was an indication that he did not have a " 'settled purpose . . . to forego all parental custody and relinquish all claims to the child,' " this court upheld the district court's termination of his parental rights, stating that, "there is no better illustration of the adage 'actions speak louder than words.' " *Greeson,* 111 Nev. at 1204, 900 P.2d at 947 (quoting NRS 128.012(1)).

On the facts at bar, we conclude that Gloria's admission that she "dropped out of sight" for a year, without contacting or providing support to Destiny and Brittany, supports the district court's determination that Gloria had abandoned her children. The testimony shows that Gloria underwent extreme emotional trauma following the death of Benjamin, and thus was arguably unable to formulate a "settled purpose" to abandon her little girls. At the hearing below, the judge commended Gloria on her phenomenal progress. Nonetheless, while she may now lack the intent to abandon Brittany and Destiny, we conclude that her actions between May of 1994 and April of 1995 showed a clear intent to relinquish any and all parental rights. Even if Gloria was now prepared to parent Destiny and Brittany competently, we conclude that Gloria's progress comes too late in the lives of these two children.

*Failure of parental adjustment*

NRS 128.0126 defines failure of parental adjustment as follows:

> "Failure of parental adjustment" occurs when a parent or parents are unable or unwilling within a reasonable time to correct substantially the circumstances, conduct or conditions which led to the placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the state or a private person or agency to return the child to his home.

This court has recognized that failure of parental adjustment may provide jurisdictional grounds for termination; however, "it is

fraught with difficulties and must be applied with caution." Champagne v. Welfare Division, 100 Nev. 640, 652, 691 P.2d 849, 857 (1984). We have noted that the failure of parental adjustment comes into play in situations like the one at issue wherein a child has been placed in a foster home. *Id.* at 650, 691 P.2d at 856-57. The purpose is to evaluate the parent's efforts to adjust " 'circumstances, conduct or conditions' " within a reasonable amount of time in order to justify the child's return to the home. *Id.* at 651, 691 P.2d at 857. The main concern is permanency—a child should not be held in limbo indefinitely. *Id.; see also* Matter of Parental Rights of Montgomery, 112 Nev. 719, 917 P.2d 949 (1996).

In 1995, the Nevada Legislature amended NRS 128.109 to add certain new considerations of parental conduct. NRS 128.109(1)(b) states that:

> If the parent or parents fail to comply substantially with the terms and conditions of a plan to reunite the family within 6 months after the date on which the child was placed or the plan was commenced, whichever occurs later, that failure to comply is evidence of failure of parental adjustment as set forth in paragraph (d) of subsection 2 of NRS 128.105.

Destiny and Brittany were taken from Gloria on March 19, 1993, and a case plan was developed that May. The testimony shows that Gloria understood the major provisions of her case plan and the consequences of failure to satisfy its mandates in a reasonable time. Gloria also acknowledged that having had substantial interaction with the foster care system and social workers, she knew that there were resources available to help her implement the case plan. Notwithstanding those resources, the terms of that case plan had yet to be satisfied, more than two years after its inception.

We conclude that clear and convincing evidence supports a finding of failure of parental adjustment. Gloria failed to comply with the case plan in that she disappeared for one year, during which time she failed to visit Destiny and Brittany, failed to maintain contact with DCFS, and failed to provide support for her children or comply with the case plan to any other extent. While it is true that just prior to Benjamin's murder, Gloria was progressing and reunification seemed viable, part of parental adjustment is demonstrating the ability to put the welfare of one's children above oneself during times of crisis. While we recognize Gloria's anguish and vulnerability following her husband's brutal killing, the fact is that Gloria would not or could not recognize that two little girls, who had just lost their father, were also

vulnerable and suffering an emotional crisis at the simultaneous disappearance of both of their biological parents.

We conclude that the evidence clearly and convincingly proved the jurisdictional grounds of abandonment and failure of parental adjustment.[6]

### Dispositional grounds

Dispositional grounds are present "[i]f under no reasonable circumstances the child's best interest can be served by sustaining the parental tie." Champagne v. Welfare Division, 100 Nev. 640, 652, 691 P.2d 849, 858 (1984). In 1995, the Nevada Legislature amended NRS 128.105 to state that "[t]he primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination."

At the hearing, when asked whether she thought additional efforts from DCFS would make reunification with Gloria feasible, Denley replied "it could go in either direction." In discussing the inevitable trauma that would occur should Destiny and Brittany be separated from their foster family, Denley explained that therapeutic intervention (i.e., counseling) could lead to a successful reunification with Gloria, but removal was just as likely to cause "reactive detachment disorders" in the girls because they could not remember that Gloria was their mother. Denley concluded, "I think that their removal would be very traumatic for them because of the fact that they're now cognizant human beings . . . ." She also expressed concern over the potential for a return to drug dependence given Gloria's long history of drug abuse.

At the conclusion of the termination hearing, the district judge stated that

> [R]elative to the dispositional grounds, and frankly this is the issue of the case that is . . . very difficult. It's very difficult only if you review this case from the perspective of Mrs. Gonzales.
>
> It would be very nice to award Mrs. Gonzales these children as an expression of what she has done with her life. I agree with [Gloria's counsel] that as such an expression, you know maybe Mrs. Gonzales at this point has earned the

---

[6]The dissent contends that there can be no failure of parental adjustment in this case because Gloria did not "willfully [have] a 'purpose' to relinquish her parental rights nor to flout the authority of [DCFS]." However, there is no willfulness requirement in our defining statute; NRS 128.0126 provides that this jurisdictional ground exists where a parent is unwilling *or unable* to adjust.

right to have these children back. That, however is not the test. The test is what is in the best interest of these children. These children, while Mrs. Gonzales, and Mr. Gonzales during the time that he was alive, failed to make the adjustment that apparently now has been made. These children continue to grow.

They were placed in foster care, they got on with their lives. And frankly at this point there's another family to consider and that is the potential adoptive family. They have bonded to that family and this Court was very impressed with the abilities of the foster parents and what they have done. And for all those days and mornings and weeks when these children had problems, it was the foster family that has been there for them and not the mother.

The Court does not find that it is in the best interests of the children to place them back with Mrs. Gonzales. The Court does find by clear and convincing evidence that the dispositional ground has been met by the State and that the best interests of these children is clearly served by ordering the termination in this case and allowing them to continue that life they have had without concern and without future worry from what may or may not happen in the very unstable life of Mrs. Gonzales.

We agree with the district court's determination that it would be in the girls' best interests to sever Gloria's parental rights. During the first few months after Benjamin had died and Gloria had disappeared in May of 1994, Destiny and Brittany often asked their foster mother, "when will [we] see my Mommy and Daddy Gonzales?" Eventually, the girls stopped asking, and by the time Gloria reappeared in their lives (in May of 1995), Gloria was no more than a friendly stranger to the girls.

Destiny and Brittany have received nothing but support and affection from the foster family they have resided with these past few years. In the words of the social worker, Denley: "[Destiny and Brittany] are intelligent girls and they love these people [the foster family]. And do you take children away from a loving, happy family who have supported them for over two years?"

Gloria asked the lower court to show compassion and understanding by giving her a second chance to parent Destiny and Brittany, notwithstanding her year-long absence, where she admittedly "dropped out" of her children's young lives. We note that the district court went out of its way to acknowledge the tragic circumstances that enveloped the Gonzales family. However, the district court ultimately followed the mandates of this state's law in giving primary consideration to the best interest of Destiny and Brittany. Destiny and Brittany have been in a stable

and loving home for four years—more than half of their young lifetimes—and they no longer know their biological mother.[7] We conclude that the district court did not err in its determination that it would be patently against their best interests to reinstate Gloria's parental rights.[8]

## CONCLUSION

We conclude that clear and convincing evidence existed to support the district court's conclusion that jurisdictional and dispositional grounds existed to support the termination of Gloria's parental rights. Therefore, we affirm the judgment rendered below.[9]

SHEARING, C. J., and YOUNG, J., concur.

SPRINGER, J., dissenting:

This case represents another in a growing series of unlawful and unnecessary judicial terminations of the parental relationship. The termination here was *unlawful* because jurisdictional grounds for termination have not been established and *unnecessary* because it certainly cannot be said in this case that " 'under no reasonable circumstances [can] the [children's] best interest . . . be served by sustaining the parental tie.' " Greeson v. Barnes, 111 Nev. 1198, 1205, 900 P.2d 943, 948 (1995) (SPRINGER, J., dissenting) (quoting Champagne v. Welfare Division, 100 Nev. 640, 652, 691 P.2d 849, 858 (1984)).

Two jurisdictional grounds have been asserted by the State in this case, abandonment and failure of parental adjustment. According to the applicable statute, before children can be adjudi-

---

[7]The dissent accuses the court of terminating Gloria's parental rights "just because [Destiny and Brittany] have 'bonded' " to their foster family. We agree with our colleague's conclusion that it would be grave error to terminate this fundamental right "merely because [Destiny and Brittany] have 'bonded' with someone other than their natural parents." However, the dissent trivializes the relationship between these little girls and the family they have lived with for four years by pejoratively referring to these ties as "pop psychology bonding."

Destiny and Brittany consider their foster family to be their true and only family, as they have no memory of their short time (one and two years, respectively) with the Gonzaleses. The facts of this case clearly show that something more than "pop psychology bonding" has grown between the girls and their foster family.

[8]In response to the dissent's unsupported rhetoric accusing this court of an overweening desire to snatch children away from the "poor and handicapped," we note that this decision is neither based upon Gloria's financial status nor her physical capabilities, or any lack thereof.

[9]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this appeal.

cated as abandoned, the parent must be shown to have had a "settled purpose . . . to forego all parental custody and relinquish all claims to the child." NRS 128.012(1). The "settled purpose" of the mother in this case has not been to relinquish all claims to her children but, rather, steadfastly to maintain her maternal relationship at all costs. There is nothing in this record that would lead one to believe that this mother had the slightest intention, ever, to give up or to "relinquish all claims" to her children. There is no way in which a factfinder could have concluded that this mother abandoned her children—unless one were to misapply the "presum[ption]" of abandonment contained in NRS 128.012(2).

A presumption is created by NRS 128.012(2) whereby the parental rights of disappearing parents can be terminated without the State's being put to the proof of the parents' intention and purpose to "relinquish all claims to the child."[1] Under NRS 128.012(2), if a wayward parent absconds and leaves a child "in the care and custody of another without provision for his support *and* without communication for a period of 6 months," such a parent is "presumed to have *intended* to abandon the child." (My emphasis.)[2] Although the presumption might on rare occasions be employed to shift the burden of going forward on the abandonment issue to a respondent parent, to my way of thinking, the statutory presumption of abandonment was created principally to facilitate the termination process in cases where a parent disappears, *incommunicado,* leaving a child to be cared for by others *and* without providing any means for the child's support. The presumption is not intended to effectuate parental severance in cases, like this one, in which a parent who has been temporarily indisposed and unable to attend to parental duties returns, claiming the right to restoration of parental custody.

---

[1] The phrase "relinquish all claims to the child" is part of the definition of abandonment contained in NRS 128.012(1).

[2] First, I would note that the statute does not create a presumption of abandonment but, rather, a presumption to abandonment. The provision relating to the *act* of leaving a child without support and the provision relating to the intention to abandon, evidenced by a failure to communicate, are in the disjunctive. Although during the period that this mother was in residential treatment, she admits to her failure to communicate with welfare authorities, she has certainly rebutted any claim that she *intended.* I find neither proof nor court finding to support the *act* of abandonment, to "leave the child in the care and custody of another without provision for his support." Although it appears that there was a period during which this mother did not actually pay child support, it would not appear that she just "left," leaving the children with no *provision* for support. The children were certainly being provided for at the time of the disruption in this mother's life, and she did not simply "take off" and "leav[e] [her children] without provision for [their] support."

We have seen a palpable disposition on the part of the family courts, largely endorsed by the decisions of this court, to interpret NRS 128.012(2) as virtually a conclusive presumption of abandonment, by which a six-months absence is equated by the family court to the jurisdictional ground of abandonment, notwithstanding a showing that the parent had a justification for the failure to communicate and demonstrated clearly that there was at no time even the slightest intention or ''settled purpose . . . to forego all parental custody and relinquish all claims to the child.''

This mother explained to the court (and it would appear from the transcript of the proceedings (see footnote 6) that the court believed her) that her failure to communicate was the direct result of the trauma that she suffered by reason of her having witnessed, in the presence of her children, the brutal murder of her husband of twenty years and the father of the children. She told the court that her life became a ''blur'' after this experience and that she fled to California in confusion and in the fear that the murderer of her husband was going to kill her too. Part of her reaction to her husband's murder was to return to a drug habit that had developed earlier in her life; and part of the period in which she remained incommunicado was spent in an eight-month residential drug rehabilitation program in which she was able to break her drug habit, rediscover her religious faith and restore her self confidence. When she left the drug rehabilitation center, she contacted Nevada welfare officials, telling them that she was ready and able to resume her parental duties. Nevada welfare officials told her, in effect, that she was too late, that termination proceedings had been commenced and that they intended to carry these proceedings through to completion.

Before coming to Nevada to get Destiny and Brittany, the mother's other two children, Vanessa and Crystal, were returned to the mother by California welfare authorities, after her successful completion of the drug rehabilitation program. At this time it cannot be denied that she was leading a happy and productive life, residing with her other two daughters and with a dependable and caring man who was providing a father for her children. She begged the Nevada family court to allow her to keep her family together and not to separate her permanently from two of her four children and not to separate the sisters from each other. In response to her plea, the court ruled in favor of the State's petition and decided that rather than permit the family to be united it would terminate her parental rights, split the family in two and order that two of Mrs. Gonzales' daughters, Destiny and Brittany, should remain in foster care.

In this dissent I do not find it necessary to catalogue all of the travails of this unhappy mother, but a number of things remain

clear throughout: Gloria Gonzales is not an unsuitable parent[3]; Gloria Gonzales did not abandon Destiny and Brittany; and Gloria Gonzales did not "fail to adjust" to programs imposed upon her by welfare authorities.[4] Gloria Gonzales became temporarily incapacitated and then, as readily seen by the trial judge did "a lot of things that very few people are capable of doing" and successfully got her "life straightened back out." What any reader of this record will readily see is a mother who got temporarily off track, a mother who did a remarkable job of getting back on track and a mother who deserves to have her family put back together again.

In this case the district court made it very clear that in concluding that there were jurisdictional grounds for termination it relied on the "presumption of abandonment under NRS 128.012" and the presumption in NRS 128.109 that if parental adjustment is not completed within six months there is presumption of a failure to adjust. If the trial court had not (incorrectly, I believe) invoked these presumptions, there would be no basis at all for the action taken by the family court in this case.

The mother in this case creditably overcame almost overwhelming obstacles. She was able to put her life together and to persuade California officials to place her other two daughters back into her home, only to be told when she came to Nevada that it was too late and that, as put by the trial judge, Destiny and Brittany "have bonded to [a new] family." I suggested in another dissent to another unlawful and unnecessary severance of natural parental rights, that the "State seems to be running amok, spouting pop psychology and terminating parental rights in cases where it is clearly not necessary to do, particularly in cases of poor and otherwise handicapped parents." Matter of Parental Rights as to Deck, 113 Nev. 124, 930 P.2d 760 (1997). I see the same pattern in the present case. I see emerging in this state a

---

[3]"[W]e must remember that poverty, sickness, and other such eventualities may result in the separation of children of a loving and quite *suitable* parent. There is always the risk that passage of time might result in a situation in which a child develops new relationships—becomes "integrated" into a foster family or otherwise becomes estranged from natural parents. Caution must be exercised not to allow termination proceedings to be carried out absent a showing of unsuitability on the part of the parent by reason of the parent's fault or incapacitation." *Champagne,* 100 Nev. at 651, 691 P.2d at 857.

[4]As discussed in the text any supposed abandonment or failure to adjust in the case is attributable to the stormy period in her life during which she was admittedly out of contact with her children and unable to attend to the specific duties to "adjust," which were imposed upon her by welfare authorities. Mrs. Gonzales never willfully had a "purpose" to relinquish her parental rights nor to flout the authority of the Division of Child and Family Services.

new, unconstitutional standard for termination of parental rights: If children in foster care "bond"[5] with their foster parents, it's "goodbye forever" to the natural parents. It is regrettable indeed that this court, now to be followed by the trial courts, have abandoned the constitutional mandates of *Champagne* and *Santosky* and are apparently willing to permit parental rights to be terminated in virtually any case in which children are found to be agreeably ensconced and bonded in a foster home.

As I see the present case, the family court judge reasoned as follows: The children were doing well in their foster home; it was not in their best interests at the time for them to leave that home and, therefore, the parental rights of the children's mother must be terminated. This reasoning, of course, is legally and constitutionally unacceptable. Even if there had been an abandonment or a failure to adjust in this case (I do not see how there could possibly have been either, under the circumstances of this case), the district court would not have been empowered to terminate parental rights unless it were able to conclude that under no reasonable circumstances was the child's welfare and best interest served by sustaining parental ties. Champagne v. Welfare Division, 100 Nev. 640, 691 P.2d 849 (1984). It is inconceivable that any court could find in this case that there was no way in which the children's best interests could be served *only* by taking them permanently away from this mother. In my view, just the opposite is true. The children's best interests would be served by preserving the natural parental rights and keeping this mother and her four children together in one home. All that the trial court found with regard to the necessary element that the children's interests could not be served by leaving the maternal ties intact was:

> The Court does not find that it is in the best interests of the children to place them back with Mrs. Gonzales. The Court

---

[5]"Bond" and "bonding" are pop psychology terms taken from the pop psychology best-seller, *Beyond the Best Interests of the Child,* a somewhat antiquated paperback that proposes an unproved psychological theory that the best interests of children are served by terminating natural parents' parental rights and permanently investing parental rights in the children's foster parents, in cases in which children have "bonded" with these surrogate parents. Joseph Goldstein, Anna Freud, and Albert Solnit, *Beyond the Best Interests of the Child* (1973). Whatever may be the validity of this psychological theory, its direct application to permanently depriving natural parents of their children just because they have "bonded" (whatever that means) to someone else is contrary to our law and violative of our federal Constitution. See, for example, Santosky v. Kramer, 455 U.S. 745 (1978), which recognizes a fundamental property right in parenthood and, in my opinion, prohibits the permanent severance of parental relationships merely because children have "bonded" with some one other than their natural parents.

does find by clear and convincing evidence that the dispositional ground has been met by the State and that the best interest of these children is clearly served by ordering the termination in this case and allowing them to continue that life they have had without concern and without future worry from what may or may not happen in the very unstable life of Mrs. Gonzales.[6]

The foregoing recital, far from holding that there is no way to serve the children's best interest short of legal severance of the maternal relationship, merely holds that in the court's opinion it is not in the best interest of the children at that time that they be removed from the foster home. Such a finding is immaterial in a termination case and is, as stated, a far cry from concluding that this mother's parental rights must be forever severed because under no circumstances could allowing her to continue her maternal relationship with Destiny and Brittany be in their best interest.

In the recent epidemic of terminations of parental rights of poor and handicapped parents, this is one of the best examples of when parental rights should *not* be terminated; therefore, again, I dissent.

---

[6]The quoted recital by the court seems to me to be very much at odds with the court's appraisal of Mrs. Gonzales as a person. The court addressed Mrs. Gonzales in this manner:

> I am in awe to some degree of your— of the steps that you have taken to get your life straightened back out. You have done a lot of things very few people are capable of doing. . . . I was impressed with your testimony. I was impressed with your efforts. In all candor, I believe that you're very sincere. I don't think you're putting me on, *nor do I think you're at some point going to relapse.*

(My emphasis.)