In the Matter of the Parental Rights as to LEANDRE LAMAR DANIELS, DEANDRE LAMAR DANIELS, ANDREA RENAY KIDWELL, ALLEN MICHAEL KIDWELL, and CHRISTOPHER LANIER KIDWELL, ANDRE KIDWELL and PAMELA RENAY DANIELS, Appellants, v. DEPARTMENT OF HUMAN RESOURCES, DIVISION OF CHILD AND FAMILY SERVICES, Respondent.

No. 28704

January 22, 1998                                    953 P.2d 1

*Pamela Renay Daniels,* Las Vegas, In Proper Person.

*Rovacchi, Kent & Cordes,* Las Vegas, for Appellant Kidwell.

*Frankie Sue Del Papa,* Attorney General, and *Linda C. Anderson,* Deputy Attorney General, Carson City, for Respondent.

## OPINION

By the Court, SHEARING, J.:

Appellant Andre Rene Kidwell contends that the district court violated his procedural due process rights.[1] We conclude that the assignments of error are without merit and therefore affirm.

---

[1]Although Pamela Renay Daniels filed her notice of appeal, she took no steps toward advancing this matter. Daniels' attorney, with the district court's permission, withdrew as counsel for Daniels after she failed to communicate or assist him. Daniels also failed to comply with an order issued by this court directing her to seek alternative counsel, instructing that failure to comply would result in her appeal being submitted upon the record without briefing or oral argument.

In any event, based upon our review of the record, the disposition below is justified; therefore, our decision applies to her and Mr. Kidwell.

## FACTS

Pamela Renay Daniels ("Daniels") and Andre Rene Kidwell ("Kidwell") contest the termination of parental rights of five of Daniels' eleven children. The five children who are the subject of these proceedings include two sets of twins. The twins, Leandre and Deandre, were born January 22, 1988. Unmarried at the time of the twins' conception, Daniels listed either Robert McDaniel or Robert Jones as their father. Neither putative father appeared at any proceedings.

The remaining three children who are the subject of this appeal are claimed by the putative father, Kidwell. However, Kidwell has never established paternity or listed his name on their birth certificates. Andrea Kidwell was born February 7, 1989, and the second set of twins, Allen and Christopher Kidwell, were born December 7, 1989.

Child Protective Services ("CPS") had received nine referrals on Daniels' children; however, most of the supporting allegations were either untrue or unconfirmed. CPS substantiated improper supervision and physical and medical neglect in September of 1988. On March 2, 1992, Douglas Wasden, an officer with CPS, received a final referral after North Las Vegas police officers discovered five unattended children in Kidwell's filthy and unkempt apartment. Despite the police entry and search of the apartment, Kidwell slept undisturbed. The house had very little furniture and it appeared that the children had no food. Kidwell explained that he was in the process of moving from one apartment to another.

Ten children who ranged in age from three to twelve resided in the apartment. Apparently one of Daniels' children lived elsewhere. The mother's whereabouts were unknown; therefore, the officers immediately removed the five children who were present and also the remaining five (not at issue herein) who were attending school. Neither parent appeared at the protective custody hearing held the following day, nor did either parent contact CPS regarding their children.

A petition was filed alleging improper supervision of the children and that neither parent attempted to resume custody of the children. Both parents attended the hearing held before the juvenile court on March 11, 1993, and admitted to improper supervision. On March 15, 1993, Andrea, Allen, and Christopher were released to Kidwell.

CPS sent a letter to Daniels requesting her prompt response concerning the disposition of her children. Daniels failed to respond and made no effort to communicate with CPS while Leandre and Deandre remained under the agency's care. Leandre and Deandre and the remaining five children were then placed

into the custody of the Division of Child and Family Service ("DCFS") after CPS determined that Daniels no longer had an interest in caring for her children and alternative placements were not available.

### Relevant facts pertaining to Kidwell

Kidwell signed a parental treatment agreement drafted by CPS which required Kidwell to provide his children with proper care, participate in the Parent Education Program, and submit to periodic monitoring by the agency. The record reflects that Kidwell was informed that the parenting classes were without cost and that additional free counseling was available.

Despite an understanding with CPS that Kidwell was to avoid living with Daniels, Kidwell ignored this admonition and continued the cohabitation.

Kidwell's custody of Andrea, Christopher and Allen was short-lived. At trial, Kidwell testified that he gave Daniels the rent money, but unbeknownst to Kidwell, Daniels allegedly spent it on drugs. They were evicted on May 19, 1993. Kidwell was homeless and unable to care properly for his children. The inability of the protective services' officer to place the children with their paternal grandmother hastened the children's placement with DCFS on June 24, 1993.

Kidwell acceded to the DCFS case plan which required him to: (1) maintain adequate and stable housing; (2) secure stable employment; (3) seek counseling; (4) pay child support in the amount of $300.00 per month; (5) obtain safe child care and utilize community resources; and (6) avoid contact with Daniels during her drug use.

The DCFS social worker instructed Kidwell to sever his ties with Daniels. According to DCFS, Kidwell was jeopardizing the children's welfare by fueling Daniels' drug habit with money that he received from Aid to Dependent Children ("ADC"). Kidwell, however, was unwilling to sever the relationship and claimed that he planned to marry Daniels shortly.

Kidwell had sporadic contact with DCFS during the two-and-a-half-year period that followed. The DCFS social worker testified that her inability to contact Kidwell and Daniels posed a formidable problem. For example, the social worker testified that Kidwell's mother was her best contact because Kidwell was frequently changing jobs and residences. Kidwell visited his children on only one occasion during the two-and-a-half-year period, and despite his caseworker's efforts to arrange another visit, Kidwell failed to confirm the arrangement.

Kidwell, however, testified that he saw his children approximately six or seven times between June of 1993 and February of

1996. Other than Kidwell's testimony, there is no record of these additional visits. One verified visit occurred at DCFS and the others were allegedly at Child Haven. During his visits, Kidwell testified that the children were hateful towards him and said they had other parents. Kidwell testified that he thought his rights were terminated; therefore, he did not stay in touch with the children.

Kathleen Petit ("Petit"), a DCFS social worker assigned to the case in January 1995, testified at trial that Kidwell failed to make any progress on his case plan. Kidwell was unemployed, without a permanent residence, and living with his mother. Petit suggested to Kidwell that he enroll in a parental training class as a show of good faith. Petit instructed Kidwell to call her the following day and she would arrange a visit with his children. Petit had no further contact with Kidwell. Moreover, Kidwell failed to pay any child support, establish paternity, or comply with the DCFS case plan.

Kidwell married a woman other than Daniels in October 1995. Notwithstanding his recent one-month marriage, he tried to reconcile with Daniels following her release from prison. At the time of trial, Kidwell lived with his newlywed and mother-in-law, and relied on their incomes because he was unemployed. Kidwell stated that he earned only $2,600.00 in the previous year.

*Relevant facts pertaining to the children*

When DCFS gained custody of Leandre and Deandre on April 21, 1993, the DCFS caseworker testified that the twins had numerous behavioral problems. The girls exhibited significant anger and violence and possessed atypical sexual knowledge. Another social worker employed by Specialized Alternative for Family and Youth of America ("SAFY"), an agency specializing in placing children in therapeutic foster homes, who was assigned to Leandre and Deandre, testified at trial that the girls had uncontrollable behavior and required structured therapeutic foster care. DCFS immediately placed the girls in counseling and attended to their special educational needs. The girls generally responded well following their placement in a structured setting and stable home environment. The SAFY social worker testified that these two girls were adoptable.

Allen and Christopher also exhibited behavioral and developmental problems. The caseworker testified that the boys were extremely violent with each other. Prior to gaining custody of the boys, DCFS observed bruises and scars on the boys that were attributed to the twins hitting each other with bats. Further, Allen and Christopher smeared feces on the wall and urinated inappropriately.

Allen and Christopher were deemed fire starters and were subsequently referred to SAFY in November 1995. SAFY also determined that the twins had developmental and behavioral problems which required an environment that was more structured than a typical foster home. When the boys were initially referred to SAFY they were approximately four years old, yet engaged in such dysfunctional behavior as finger sucking and baby talk.

After a year of therapy at Child Behavioral Services and the combined efforts of the boys' foster parents, the caseworker testified that Allen and Christopher progressed significantly. For example, their vocabulary increased tremendously, their personal hygiene rose to an acceptable level, and they were able to interact with each other without constant battling. According to the SAFY caseworker, the children received superb foster care. Moreover, both boys were attending regular school.

Given their significant improvement in several areas, the caseworker concluded that the boys were ready for adoption. The caseworker acknowledged, however, that the twins' mixed race could complicate their chances for adoption.

The DCFS social worker initially assigned to Andrea, age four, testified that she lagged developmentally behind all of the other children. She was unable to differentiate between colors, shapes and numbers, and her speech was barely intelligible. Further, she would urinate in the corner rather than in the bathroom. DCFS addressed her special needs and noticed an immediate turnaround after placing her in preschool. The DCFS caseworker testified that Andrea "blossomed" while in foster care. She also testified that there were numerous factors that could frustrate the children's adoptions. These included the children's mixed racial composition, age, and learning and emotional disabilities.

*Relevant facts pertaining to Daniels*

DCFS filed an unsigned case plan for Daniels in July 1993, because the agency could not locate her. Essentially, the plan mirrored Kidwell's case plan. Juvenile court had established that Daniels was using drugs; therefore, in addition to maintaining stable housing, employment, and attending parenting classes, Daniels was required to submit to random urinalysis for six months and pay $200.00 per month in child support.

Daniels testified that she abused cocaine, and while pregnant with Allen and Christopher, she was convicted of possession of cocaine in August of 1989 and sentenced in November of 1993. After receiving a suspended sentence and probation, Daniels was rearrested two months later and convicted in August of 1994 for attempted possession. She spent the next seventeen months in prison.

Upon her release from prison, Daniels was assigned to Kathleen Petit, the DCFS social worker. Daniels had neither a permanent address nor gainful employment. During the twelve-month period that the caseworker was assigned to Daniels and to the Kidwell children, Daniels never provided DCFS with a phone number or permanent address.

Petit, however, made earnest attempts to locate Daniels. For example, Petit engaged the assistance of a parent locator service and contacted family members. Petit testified that, during the year prior to Daniels' release from prison, Daniels sent only one letter to the children. Moreover, Daniels failed to pay any child support. After her release, Petit testified that Daniels failed to make any progress on her case plan. According to Petit, the children had only a bare recollection of their mother.

Petit concluded that reunification of the children with either parent was unlikely because the children have special needs which neither parent has addressed.

## DISCUSSION

*Whether the Eighth Judicial District Court or DCFS violated Daniels' and Kidwell's procedural due process rights in terminating their parental rights*

> 1. *Kidwell's due process rights were not violated by failing to appoint counsel during the underlying juvenile proceedings*

Kidwell contends that the district court violated his procedural due process rights when the juvenile court failed to appoint counsel after his children were removed. Specifically, Kidwell alleges that competent counsel could have provided guidance and clarified his confusion during the juvenile court's review of his DCFS case plan. Kidwell asserts that counsel could have facilitated a reunification with his children. Kidwell further argues that DCFS failed to make a reasonable effort to reunify his family.

The United States Supreme Court has firmly established the parent-child relationship as a fundamental liberty interest. Santosky v. Kramer, 455 U.S. 745, 753 (1982); *see also* Quilloin v. Walcott, 434 U.S. 246, 255 (1978). Thus, when a state initiates a parental termination proceeding, it terminates the parent's fundamental liberty interest and does not merely infringe on the interest. Lassiter v. Department of Social Services, 452 U.S. 18, 27 (1981). "If the State prevails, it will have worked a unique kind of deprivation . . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* (Footnote omitted.)

Matthews v. Eldridge, 424 U.S. 319, 335 (1976), sets forth a

three-part balancing test for identifying the existence of procedural due process deficiencies when a fundamental interest is at stake. First, the court must consider the effect of the official action on the private interest. Second, the reviewing court must assess the risk of erroneous deprivation through the procedures used and the value of adding additional procedures. Third, the court must weigh the government's interest—the function involved and any additional burdens imposed in implementing additional procedures.

Recently, we addressed due process issues in their relation to terminations of parental rights. *See generally* Matter of Parental Rights as to Weinper, 112 Nev. 710, 918 P.2d 325 (1996). In *Weinper,* we examined the due process procedures exercised by other states in termination proceedings and noted that parents are entitled to: "(1) a clear and definite statement of the allegations of the petition; (2) notice of the hearing and the opportunity to be heard or defend; and (3) the right to counsel." *Id.* at 713, 918 P.2d at 328.

We are now asked to address the procedural due process requirements afforded parents at an earlier juncture, specifically, when children are removed from the parents' care and custody on a *temporary* basis.

DCFS argues that the juvenile court proceedings upon removal of the children differ from a termination action. Termination proceedings are governed by NRS 432B.420, which provides, in pertinent part:

> 1. A parent or other person responsible for the child's welfare who is alleged to have abused or neglected a child may be represented by an attorney at all stages of any proceeding under NRS 432B.410 to 432B.590, inclusive. . . . [I]f the person is indigent, the court *may* appoint an attorney to represent him. The court may, if it finds it appropriate, appoint an attorney to represent the child.

(Emphasis added.)

Thus, the appointment of counsel lies within the discretion of the juvenile court.

In the formal proceedings to terminate Kidwell's parental rights, the district court addressed all three due process concerns under *Weinper.*[2] Again, Kidwell does not assert that he was

---

[2] (1) a clear and definite statement of the allegations of the petition; (2) notice of the hearing and the opportunity to be heard or defend; and (3) the right to counsel.

Weinper v. Nevada State Department of Human Resources, Division of Family Services, 112 Nev. 710, 918 P.2d 325 (1996).

denied any of these procedural due process concerns at the *termination* hearing. He contests the constitutionality of due process procedures afforded him during the underlying *removal* proceedings.

Immediately following the removal of their children, a measure considered temporary until Kidwell could stabilize his living environment, both parents admitted to improper supervision at a hearing held before the juvenile court. Kidwell also had ample familiarity with his case plan and yet failed to make any significant progress. Thus, Kidwell and Daniels were afforded and received clear and definite notice of the allegations which led to the removal of their children.

Kidwell fails to present any evidence that he did not have a clear understanding of what was expected of him during the periodic six-month juvenile court reviews. The initial court review of foster placement reflected that neither parent paid child support or made any reunification efforts. As of March 8, 1994, a Report for Periodic Review reflected that Kidwell had exercised visitation on only one occasion, was unemployed, and had no permanent residence.

Central to Kidwell's argument is his alleged confusion of when his parental rights were terminated. He claims that he failed to exercise visitation because he believed his parental rights had been terminated as of December of 1994. This was confirmed by his caseworker. In reality, Kidwell had apparently misinterpreted the court's order terminating parental rights as to Leandre and Deandre,[3] Daniels' other children. It is significant that one year later the court still considered the possibility of reunifying Kidwell with his children and thus viewed the agency's care and custody of the children as temporary.

There is some confusion as to whether Kidwell requested counsel during the underlying juvenile proceedings. DCFS alleges that Kidwell never requested counsel and directs us to the juvenile court records as support for this assertion. Kidwell argues that the exhibits of the juvenile proceedings do not contain transcripts of the actual proceedings; therefore, DCFS cannot make this allegation with certainty. Certainly, counsel would have been appointed for Kidwell had he so requested. Thus, the third procedural due process concern addressed in *Weinper* (the

---

[3]There is some confusion as to when the hearing regarding these two children occurred. Neither appellants' or respondent's briefs specify an exact date. The decision issued by the juvenile court refers to a judicial review held on March 8, 1994, wherein the court approved the recommendation to proceed with the termination of parental rights as to Daniels but directed DCFS to continue working with Kidwell with the expectation of reunifying Kidwell with his children.

right to counsel) was satisfied. The issue remains whether appointment of counsel at an earlier juncture was constitutionally mandated.

Kidwell argues his confusion could easily have been allayed had the court appointed him counsel to guide him through the juvenile proceedings.

We conclude that counsel was appointed at the critical hearing where Kidwell faced termination of his parental rights. In Lassiter v. Department of Soc. Serv. of Durham City, 452 U.S. 19 (1981), the United States Supreme Court held that the Constitution does not require the appointment of counsel for indigent parents in termination of parental rights proceedings. We conclude that temporary custody of a child does not rise to the same level as permanent removal; therefore, the court need not employ the same procedural safeguards.

Thus, we conclude that Kidwell's procedural due process rights were not violated. As previously mentioned, DCFS initially intended to remove Kidwell's children temporarily. In fact, DCFS released the children to Kidwell in less than one week. Further, Kidwell's case plan provides additional evidence that DCFS' goal was a reunification with his children. The expected length of the separation was dependent on Kidwell's satisfaction of the case plan.

The initial court review on September 7, 1993, approximately four months after Kidwell was evicted from his apartment and lost custody of his children, reveals that neither parent made any reunification efforts, nor was any child support paid. The report also reflects that despite Kidwell's knowledge of Daniels' drug problem, he persisted in associating with her. Kidwell's case plan was straightforward—he simply failed to make any progress towards satisfying its goals. While DCFS recommended that the court proceed with termination proceedings for Leandre and Deandre in March of 1994, it was only six months later that the recommendation was made with respect to Kidwell's children. The only material fact in dispute arose following the juvenile court proceeding which recommended terminating Daniels' parental rights.

We conclude that the foregoing facts taken together did not compel the discretionary appointment of counsel for Kidwell at an earlier stage of the proceedings. Kidwell could have simply asked his caseworker, or the judge for that matter, whether his parental rights were terminated. Instead, the record is replete with accounts of Kidwell's failure to communicate with his case-

workers throughout the entire process or make any progress on his case plan. There is no indication that an attorney's assistance would have aided Kidwell in satisfying the requirements of his case plan—securing adequate and stable housing, paying child support, utilizing community resources, and most importantly, avoiding contact with Daniels.

### 2. *DCFS made reasonable reunification efforts*

The touchstone of Kidwell's argument rests with his assertion that DCFS failed to follow proper procedures as set forth under federal statutes and the State of Nevada's Division of Child and Family Services Substitute Care Manual ("Manual"). Kidwell avers that DCFS failed to follow the procedures promulgated under the provisions of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620-28, 670-79. Kidwell argues that DCFS failed to: make a reasonable effort to reunify the family; conduct regularly scheduled evaluations of case plan progress; and provide a host of community services.

Kidwell's assertions are without merit. Despite Kidwell's repeated failure to make any progress on his case plan, DCFS worked with Kidwell for over two years despite a statutory mandate to commence termination proceedings six months from his noncompliance. *See* NRS 128.109.[4]

DCFS caseworkers freely admitted that they had a heavy caseload that stressed the system. Nevertheless, the agency kept adequate records and drafted a case plan for Kidwell pursuant to the DCFS Manual. In the interim, DCFS tried to place all of the children at issue with relatives.

After it was evident that Kidwell could not provide for his own children, DCFS placed Allen, Christopher, and Andrea in foster care and addressed their special educational and behavioral needs. The same attention was devoted to Leandre and Deandre. DCFS followed with a case plan for both parents, yet neither parent made acceptable progress.

We conclude that Kidwell's attempt to shift his personal accountability and responsibility to DCFS is meritless, and therefore, unavailing.

---

[4]NRS 128.109 provides in pertinent part:

> (b) If the parent or parents fail to comply substantially with the terms and conditions of a plan to reunite the family within 6 months after the date on which the child was placed or the plan was commenced, whichever occurs later, that failure to comply is evidence of failure of parental adjustment as set forth in paragraph (d) of subsection 2 of NRS 128.105.

*Whether the district court established jurisdictional and dispositional grounds by clear and convincing evidence to justify termination*

As grounds for termination of parental rights the district court found by clear and convincing evidence that the parents' conduct demonstrated abandonment and failure of parental adjustment. NRS 128.102 defines "abandonment of a child" as any parental conduct which evinces a settled purpose on the part of one or both parents to forego all parental custody and relinquish all claims to the child.

> "Failure of parental adjustment" occurs when a parent or parents are unable or unwilling within a reasonable time to correct substantially the circumstances, conduct or conditions which led to the placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the state or a private person or agency to return the child to his home.

NRS 128.0126.

A termination of parental rights requires a finding of parental unsuitability (jurisdictional grounds) and that severing the parental ties would be in the child's best interest (dispositional grounds). Champagne v. Welfare Division, 100 Nev. 640, 647, 691 P.2d 849, 854 (1984).

NRS 128.105[5] enumerates the grounds for terminating parental rights. The legislature has amended the statue by adding language

---

[5]NRS 128.105 states in pertinent part:

> The primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination. An order of the court for termination of parental rights must be made in light of the considerations set forth in this section and NRS 128.106 to 128.109, inclusive, and based on evidence and include a finding that:
> 1. The best interests of the child would be served by the termination of parental rights; and
> 2. The conduct of the parent or parents demonstrated at least one of the following:
> (a) Abandonment of the child;
> (b) Neglect of the child;
> (c) Unfitness of the parent;
> (d) Failure of parental adjustment;
> (e) Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;
> (f) Only token efforts by the parent or parents:
> (1) To support or communicate with the child;
> (2) To prevent neglect of the child . . . .

which requires the court to consider primarily "whether the best interests of the child would be served by the termination."

While *Champagne* elevated the standard of proof to "at least clear and convincing evidence" for establishing both jurisdictional and dispositional grounds, we have, nevertheless, approvingly followed several pre-*Champagne* cases for defining parental abandonment. *Id.* at 648, 691 P.2d at 854.

### 1. *Jurisdictional grounds*

In Pyborn v. Quathamer, 96 Nev. 145, 147, 605 P.2d 1147, 1148 (1980), we upheld a district court finding of abandonment where the father made no attempts to communicate with his son for a period of ten months, coupled with "token efforts, to pay support for the child." Here, Kidwell's time frame for nonsupport and communication was over two years. Additional evidence of abandonment includes lack of support, failure to communicate, and failure to send gifts. Sernaker v. Ehrlich, 86 Nev. 277, 468 P.2d 5 (1970). This court noted that Sernaker was $11,000 in arrears for wife and child support but stated that "[n]onsupport is not synonymous with the abandonment but it is a factor in determining whether a parent has abandoned his child." *Id.* at 280, 468 P.2d at 7 (1970). Kidwell did not amass arrearages totalling $11,000; however, Kidwell failed to pay any child support, establish paternity, or comply with the DCFS case plan.

In Carson v. Lowe, 76 Nev. 446, 357 P.2d 591 (1960), this court upheld the district court's termination of the father's parental rights. Over a three-year period, the father failed to support his child and made meager efforts to communicate with the child. *Id.* at 449, 357 P.2d at 593.

In Drury v. Lang, 105 Nev. 430, 776 P.2d 843 (1989), a post-*Champagne* case, we interpreted NRS 128.105[6] as requiring a substantial abandonment and something more than a parent's failure to communicate with her children for a period of six months. *Id.* at 433, 776 P.2d at 844.

Kidwell's conduct was egregious. Contrary to DCFS' instructions, Kidwell relentlessly associated with Daniels while in the throes of her drug addiction, thereby placing his children's welfare in serious jeopardy. Even more astonishing was his intent to marry Daniels after only one month of marriage to another woman. Moreover, Kidwell made no efforts to attend free parenting classes or make any noteworthy attempts at reunification.

---

[6]*See* n.5.

There is ample evidence in the record establishing Daniels' failure of parental adjustment and intentions to abandon her children. Daniels admitted to improper supervision at a hearing held before the juvenile court. Daniels made no effort to communicate with CPS or DCFS. During her seventeen months in prison she sent the children one letter. Upon release, Daniels never provided DCFS with a phone number or permanent address. As with Kidwell, Daniels failed to pay court-ordered child support and made no progress on her case plan.

We conclude that the jurisdictional grounds of abandonment and failure of parental adjustment were established by clear and convincing evidence for Kidwell and Daniels.

### 2. *Dispositional grounds*

The proper inquiry under the dispositional prong is simply: "If under no reasonable circumstances the child's best interest can be served by sustaining the parental tie, the dispositional grounds for termination exist." *Champagne,* 100 Nev. at 652, 691 P.2d at 858.

Kidwell contends that DCFS' documentation of the children following their removal from the home is inadequate; therefore, the record is not an accurate reflection of the children's developmental and behavioral problems. Kidwell specifically points to a gap in documentation between the time the children were placed in custody and the time they were placed in the therapeutic home. Kidwell suggests that the children's behavioral problems emerged *after* the children's removal because "[t]here is no documentation from therapists revealing that the children acted out in the manners described prior to being in the custody and control of Respondent."

Once DCFS gained custody, the agency immediately addressed the children's special needs. Soon thereafter, DCFS provided a stable and structured home environment. Despite Kidwell's claims that the children's dysfunctional behavior occurred after their removal from his care and custody, a DCFS caseworker observed bruises on Allen and Christopher which were attributed to the boys hitting each other with bats.

Once DCFS placed the boys in therapeutic foster homes and provided a year of therapy at Child Behavioral Services, the boys made significant progress. Such efforts made it possible for them to attend school and enhanced their chances for adoption.

When DCFS initially gained custody of Andrea, she was unmanageable, her sanitary habits were deficient and she was

unable to differentiate between colors, shapes and numbers. Thereafter, Andrea "blossomed" while in foster care.

Admittedly, the children's mixed racial composition, age, and learning and emotional disabilities are factors that could impede their chances for adoption. The juvenile court duly noted this concern by stating "[i]t would be regrettable if the children were to remain in foster care simply because an adoptive home could not be obtained."

Petit, the DCFS caseworker assigned to this family, concluded that reunification with either parent was unlikely and that keeping the children in limbo for over two years was excessive. Clearly, neither parent has demonstrated that they are capable of providing a stable and nurturing environment for these children.

DCFS' shortcomings are minimal in comparison to the deficient efforts displayed by both parents. The record clearly portrays dysfunctional parents ill equipped to deal with their children's special needs. For the foregoing reasons, we conclude that the district court established jurisdictional and dispositional grounds by clear and convincing evidence, justifying termination of parental rights. Accordingly, we conclude that permanently severing the parental relationship is in the children's best interest.

We also conclude that the due process concerns are without merit.

Based on the foregoing analysis, we affirm the decision of the district court to terminate the parental rights of Andre Kidwell as to Andrea, Allen and Christopher, and terminate the parental rights of Pamela Renay Daniels as to all five minor children: Leandre, Deandre, Andrea, Allen and Christopher.[7]

ROSE and YOUNG, JJ., concur.

SPRINGER, C. J., dissenting:

The State has permanently deprived these parents of five of their eleven children because they are (to use the language of the trial court) "destitute." Today, we see five more children being swept away by the State's child-devouring juggernaut because, as put in the majority opinion, the parents "could not provide for [their] own children."

The parents' destitution and poverty are not, of course, put forth as the grounds for depriving these five children of their natural parents. The "official" grounds for termination of the parental relationship are "abandonment" and "failure of parental adjustment." Abandonment and failure of parental adjustment have become the standard rubric for taking poor children away

---

[7]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this matter.

from their parents.[1] When we examine these grounds as "jurisdictional grounds" in this case, we can see that the children lost their parents primarily because their parents were "destitute."

If we look at the official ground of "abandonment" for example, it is easy to see that in this case (as in most cases where abandonment is relied on to terminate the rights of parents) there is not even a hint of the parents' having any intention to abandon or "relinquish all parental rights" to five of their children. The evidence in this case shows only an *inability* to support their children, not an *unwillingness*. The parents' "lack of support," which is at the root of the abandonment charges, is based upon their inability and failure to make child support payments to the State. (For example, Mr. Kidwell was required to pay $300.00 per month in support when welfare agents knew that he was only earning $200.00 per month.)

This case is yet another example of the State's growing inclination to seek termination of parental rights "for reasons of poverty."[2] The pattern is familiar:[3] Hungry children, dirty children,

---

[1] There is mention in the majority opinion of drug abuse on the part of one of the parents. This failing is not, however, relied on by either the trial judge or the attorney for the State as a ground for termination; and, again, the termination is based on a supposed "abandonment" and failure to "adjust," which, I maintain, are in most of these kinds of cases, simply euphemistic terms for disabling poverty and "destitution."

[2] *For Reasons of Poverty,* written by University of Nevada, Las Vegas professor Leroy Pelton, Ph.D., should be required reading for jurists who are wont to take children away from their parents because they are poor. Referring to a 1990 White House Conference report on poor and "dependent" children, which recommended that "the home should not be broken up for reasons of poverty," Dr. Pelton presents a most valuable social science study of the overriding role of poverty in child-removal and termination proceedings. The author establishes that poverty is "the most predominant characteristic of parents" whose children are removed from the home. Dr. Pelton concludes that the cause of removal of children from their homes and of foster care placement is "often that the natural parents, frequently due to poverty, do not have the resources to off-set the impact of situational or personal problems, which themselves are often caused by poverty, and the agencies have failed to provide the needed supports." Noting that "it is largely poor children that populate the foster care system," Dr. Pelton provides us with the following salient quotation from a paper by Bernice Boehm:

> It is more than half a century since the tenet was first annunciated that "no child should be separated from his family by reasons of poverty alone." It is unforgivable that in more than half a century this basic principle, to which there is such strong commitment, has not been implemented. . . .

During much of child-welfare history, "poverty alone" was taken as being sufficient reason to remove children from their homes. Once it was accepted that children should not be removed from their homes because of "poverty alone," Dr. Pelton explains that "it was incumbent upon the child removers to make separate 'findings' of the unfitness and immorality of impoverished

unkempt children, and improperly attended children come to the attention of welfare officials. The children are, without the parents' having the benefit of legal counsel, "temporarily" removed from their homes. The poor parents are forced into submitting to some kind of "plan" devised by welfare officials. Frequently, the poverty-stricken parents are not able to cope with the State's demands; and legal proceedings are instituted to deprive the poor parents of their children permanently, and, more importantly, to deprive the poor children of their parents.

As I see the operation of the welfare system in this state, when child-rearing problems arise as a result of poverty, the problem is rarely addressed by attending to the poverty but, rather, by assigning blame to the parents and then permanently depriving the children of their natural parents. The poor parents in these

parents [and] [in] more recent times the parents are not perceived as immoral, but as psychologically defective in some way. . . . The behavioral effects of poverty would now call forth the attribution of motives and personality characteristics indicative of psychological deficiencies. Thus, the reasons would be couched in modern benevolent language of psychology, but the results would be the same: The victims of poverty would be blamed, and the children would be removed." *Pelton* at 107-108.

In Nevada, poverty, as such, is, of course, not a ground for termination of parental rights, but the "behavioral effects" of poverty are. Welfare officials ordered these parents, in effect, not to be poor anymore. As pointed out in the majority opinion, they were ordered to stop living in squalor and, rather, to "maintain adequate and stable housing." They were ordered to get some money and "secure stable employment" and, as always, to "seek counselling." Most importantly, the State ordered these destitute parents to pay to the State "child support in the amount of $300.00 per month." (Kidwell, according to the majority, earned a little over $200.00 per month.) The parents' inability (and thus their failure) to pay this amount was taken by the State as evidencing *abandonment* of the children and as grounds for terminating parental rights.

I commend Dr. Pelton's book to any one who does not yet understand that most of the terminations of parental rights ordered by Nevada's courts are based on poverty-by-another-name, namely (as in this case), "abandonment," "lack of support, failure to communicate, and failure to send gifts" and "failure of parental adjustment."

[3]Cooley v. State, Dep't Hum. Res., 113 Nev. 1191, 946 P.2d 155 (1997) (SPRINGER, J., dissenting) (poverty and temporary immaturity of teenage mother); Matter of the Parental Rights of Gonzales, 113 Nev. 324, 933 P.2d 198 (1997) (SPRINGER, J., dissenting) (parent temporarily indisposed and unable to attend to parental duties); Matter of Parental Rights as to Bow, 113 Nev. 131, 930 P.2d 1128 (1997) (SPRINGER, J., dissenting) (abject poverty); Matter of Parental Rights as to Deck, 113 Nev. 124, 930 P.2d 760 (1997) (SPRINGER, J., dissenting) (schizophrenic parent); Bush v. State, Dep't Hum. Res., 112 Nev. 1298, 929 P.2d 940 (1996) (SPRINGER, J., dissenting) (mentally deficient parents); Matter of Parental Rights as to Weinper, 112 Nev. 710, 918 P.2d 325 (1996) (SPRINGER, J., dissenting) (fraudulently presenting duplicate of prior welfare report in lieu of current status report and not informing court of events during review period denies parent opportunity to comply with reunification plan).

kinds of cases are invariably found to have psychological or moral problems that must be "treated." The children are removed from the home in order to give the parents an opportunity to reform, that is to say, to "adjust" and "reunify" with their children. The parents are almost always required to submit to demeaning, and often totally unproductive, "counselling," "parent training," and "family therapy." The result is almost always the same. The parents remain poor; their poverty cannot be "counselled" away; parents, forcefully separated from their children, become estranged from their children, who are placed in a federally-subsidized foster home with "new parents"; and, finally, the State moves to terminate the parental rights of the poor natural parents.

As with so many of our past termination cases involving poverty and disability, my principal concern in this case is employing poverty as "jurisdictional grounds," depriving poor children of their parents "by reason of poverty." There are, however, other reasons why the judgment of the trial court should be reversed. The first of these reasons is the failure of *dispositional* grounds; the second is the failure to provide these "destitute" parents with legal counsel to defend themselves and their children at the critical stage in these proceedings, namely, the judicial removal of these children from their parents' homes.

The majority correctly defines dispositional grounds. Under Nevada law, parental rights cannot be terminated unless it is convincingly proved that the children's best interest cannot, under any reasonable circumstances, be served by sustaining the parental ties. In this case, it is not that the interests of the children cannot be served by maintaining the parental ties, it is quite clear that the children's best interest cannot possibly be served by permanently depriving them of their parents. These children are homeless and parentless. Some are biracial, some are emotionally disturbed; and, according to welfare officials, prospects for a future adoption for any of these children are somewhere between impossible and "problematic." They have no place to go. Before our judicial system took its Herodian action in this case by depriving these children of their parents, the five children at least *had* parents, even if they were poor. Now they have no parents at all. This is a case of termination for termination's sake. There is no rhyme or reason to it. This court is even more clearly wrong in approving the dispositional grounds than it is in approving the ill-disguised jurisdictional ground, "for reasons of poverty."

With regard to the parents' not having counsel at the crucial time that the district court removed the children from the home, again, it is obvious that poverty is at the root of the problem.

These parents did not have an attorney because they were "destitute."[4] At oral argument of this appeal the parents' counsel represented to the court that, in his opinion, termination would not have been effected in this case if the parents had had counsel at the time the children were removed from their home. My review of the record persuades me that counsel was correct in making this representation. The trial judge had this to say about the parents' having the advice of counsel in these kinds of proceedings:

> *My honest opinion is that persons that are destitute under the statute probably should be required or should be allowed to have private attorneys.* It is not presently the law in the State of Nevada. The law in Nevada is that destitute parents may be entitled to attorneys, the Court may appoint attorneys for them in 432(B) proceedings. I agree with you, that I think the idea would be to have them appointed to all parents in 432(B) cases. . . . *I do think that perhaps it might have made a difference as to the father* [Appellant Kidwell]. It is not yet required by due process, at least from my understanding of what due process is—or what due process requirements are . . . . It's not compelled, it's not required and we don't do it.

(Emphasis added.)

I must say that it is also *my* "honest opinion" that counsel should be appointed for "all parents in 432(B) proceedings," where parents are threatened with having their children removed from the home. Once the children are removed from the home, the chances of losing the children permanently is greatly increased.

The appellant cites widespread authority for the proposition that parents should have counsel in proceedings in which their children are being "temporarily" taken away. In holding that a right to counsel in these situations was constitutionally required, the Washington Supreme Court in In the Matter of the Welfare of H. Luscier, 524 P.2d 906 (1974), quoted from the Columbia Law Review, thus:

> [S]ince there is not evidence indicating that .the average respondent who can retain counsel is better or less neglectful than one who cannot, the conclusion seems inescapable that a significant number of cases against unrepresented parents result in findings of neglect solely because of the absence of counsel. In other words, assuming a basic faith in the adver-

---

[4] "In England, Justice is open to all, like the Ritz Hotel." Lord Justice Sir James Mathew.

sary system as a method of bringing the truth to light, a significant number of neglect findings (followed in many cases by a taking of the child from his parents) against unrepresented indigents are probably erroneous. It would be hard to think of a system of law which works more to the oppression of the poor than the denial of appointed counsel to indigents in neglect proceedings.

Note, *Child Neglect: Due Process of the Parent,* 70 Colum. L. Rev. 465, 476 (1970).

In Brown v. Guy, 476 F. Supp. 771 (D. Nev. 1979), the Nevada District Court held that due process requires appointed counsel when there is a reasonable probability of termination of parental rights or of prolonged separation from a child. Almost all of the cases that come before us are based on NRS 432B proceedings which are geared toward ultimate parental termination. Because of this and because of the "inherent imbalance of experience and expertise between the parent and the state," I would adopt a *per se* rule that would provide counsel in all cases in which the state seeks removal of a child from its home.

It is clear to me that *Brown* required counsel to be appointed in the present case at the time the children were removed from the home; and I think that this alone calls for a reversal of the termination decree. The majority should have reversed the judgment of the trial court while adopting the *per se* rule that I have mentioned.[5] I dissent on this ground and because there is no showing by clear and convincing evidence of either jurisdictional grounds or dispositional grounds for "terminating" this family.

---

[5]Appellant cites in his opening brief the case of Davis v. Page, 640 F.2d 599 (5th Cir. 1981). The case was a class action suit by litigants denied representation in child deprivation cases. The class challenged the constitutionality of child dependency proceedings against indigent parents who were not provided with counsel. Perhaps this is what is needed in Nevada to slow down the wholesale termination industry.